**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| STEPHAN BYRD,<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | No. 23cv9610 (EP)<br><br>**OPINION** |

**PADIN, District Judge.**

In April 2019, a jury convicted Petitioner Stephan Byrd of three counts of armed bank robbery, two counts of brandishing a firearm during a crime of violence, one count of discharging a firearm during a crime of violence, and one count of possessing a firearm as a convicted felon. *United States v. Byrd*, Crim. No. 15-409 (D.N.J.) (the "Criminal Action"). The Court sentenced Byrd to an aggregate term of 548 months of imprisonment, and the Third Circuit affirmed that judgment. *United States v. Byrd*, No. 21-2613, 2022 WL 3666309, at *1 (3d Cir. Aug. 25, 2022) ("Appellate Opinion"). Now proceeding *pro se*, Byrd moves under 28 U.S.C. § 2255 to vacate, set aside, or correct that sentence. D.E. 1 ("§ 2255 Motion", "Motion", or "Mot.").[1]

In support of his Motion, Byrd has filed numerous certifications and an affidavit. D.E. 10 ("Byrd Cert. I"); D.E. 11 ("Byrd Aff."); D.E. 14 ("Byrd Cert. II"); D.E. 15 ("Byrd Cert. III"); D.E. 21 ("Byrd Cert. IV"). Respondent, the United States of America (the "Government"), opposed the Motion, D.E. 23 ("Answer"), and later supplemented its response, D.E. 25 ("Supplemental Answer"). Byrd replied. D.E. 40 ("Reply"). Byrd later filed two discovery motions while the

[1] Unless otherwise noted, docket citations refer to this civil action; citations to the Criminal Action are identified as "Crim. D.E."

Motion was pending: D.E. 44 ("First Motion to Compel") and D.E. 45 ("Second Motion to Compel") (together, the "Motions to Compel").

For the reasons below, the Court will **DENY** the § 2255 Motion and the Motions to Compel, as well as Byrd's requests for an evidentiary hearing and a certificate of appealability.

## I. BACKGROUND

### A. Investigation, Arrest, and Charges

Byrd's convictions arose from three bank robberies in southern New Jersey during the summer of 2014: (1) Ocean City Home Bank in Mays Landing on June 7, 2014; (2) Newfield National Bank in Vineland on July 19, 2014; and (3) Newfield National Bank in Malaga on July 21, 2014. Crim. D.E. 49 ("Superseding Indictment") at 1–7.

Separately, state and local officers investigated the July 16, 2014 nonfatal shooting of Eric Bogan in Vineland. Crim. D.E. 85 ("Mar. 22, 2017 Hr'g Tr.") at 111. Bogan told police that three men had arrived in a white sport utility vehicle. *Id.* Bogan later identified Eric "Noon" Bailey as the shooter and Shawn "Cooch" Jones as the driver. *Id.* However, Bogan did not identify the car's third occupant. *Id.* The vehicle belonged to Jones's girlfriend, Rishenka Brown. *Id.* Rishenka's sister, Chicana Brown, later arrived at the Vineland Police Department while officers were questioning Rishenka. *Id.* at 112. Chicana told investigators that Bailey and Jones had visited her after the shooting, that Bailey displayed a shiny handgun with a black handle (consistent with Bogan's description of the weapon), and that Bailey said Byrd had been in the vehicle and had supplied the gun. *Id.* at 111–12. Based on Brown's statement and information independently developed during the investigation, a New Jersey Superior Court judge issued state arrest warrants for both Jones and Byrd. *Id.* at 112–15.

Before Byrd was arrested, Jones voluntarily surrendered, admitted his involvement in the shooting, and denied Byrd's involvement. Appellate Opinion at *1.

On July 28, 2014, officers arrested Byrd on the state warrant arising from the Bogan shooting while he was driving a silver Honda resembling a vehicle reported near the bank robberies. *Id.* Employment records reviewed by law enforcement the day after the arrest showed that Byrd was at work when Bogan was shot, but those records did not foreclose Brown's allegation that Byrd had supplied the firearm used in the shooting. *Id.* at *1–2. Byrd remained in state custody while the investigations continued. *Id.* at *1.

On July 29, 2014, investigators obtained a federal warrant to search Byrd's Honda and a state warrant to search his residence, and the searches produced evidence connecting Byrd to the robberies. *Id.* at *1; Crim. D.E. 242-30 ("State Search Warrant and Affidavit") at 2–11; Crim. D.E. 242-36 ("Federal Search Warrant and Affidavit") at 2–13 (collectively, the "Search Warrants").

On September 30, 2014, federal authorities filed a criminal complaint charging Byrd with one count of armed bank robbery, in violation of 18 U.S.C. §§ 2113(a) and (d), and one count of using a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c). Crim. D.E. 1; Answer at 7. The next day, FBI agents interviewed Byrd while he remained in state custody at the Cumberland County Jail, and Byrd made recorded admissions concerning the bank robberies. Crim. D.E. 208 ("Apr. 10, 2019 Trial Tr.") at 20–21, 96–97; Answer at 6–7.

On September 21, 2016, a federal grand jury returned a seven-count superseding indictment charging Byrd with three counts of armed bank robbery, three corresponding firearm offenses under 18 U.S.C. § 924(c), and possession of a firearm by a convicted felon under 18 U.S.C. § 922(g)(1). *See* Superseding Indictment.

### B. Pretrial Proceedings, Trial, and Sentencing

#### *1. Pretrial proceedings*

The Criminal Action generated extensive pretrial litigation concerning discovery, Byrd's state arrest and continued detention, the Search Warrants, and his confession. *See, e.g.*, Crim. D.E. 58 ("Suppression and Dismissal Motion"); Crim. D.E. 67 ("2017 Motion to Compel"); Crim. D.E. 82 ("Mar. 28, 2017 Order"). In December 2016, Byrd moved to suppress his October 1, 2014 recorded statement, evidence seized from his residence and Honda, and the fruits of his state arrest, and also sought dismissal of the indictment based in part on his continued state detention. Suppression and Dismissal Motion. He argued that federal agents had worked in concert with Vineland police to use the Bogan investigation and his state custody to develop the federal robbery case, and sought communications between state and federal investigators concerning the investigations to support that theory of collusion. *See generally* Crim. D.E. 65 ("Suppression Reply"); 2017 Motion to Compel.

After an evidentiary hearing on March 22, 2017, the Court denied both Byrd's 2017 Motion to Compel and his Suppression and Dismissal Motion. Mar. 28, 2017 Order; Mar. 22, 2017 Hr'g Tr. Among other things, the Court found probable cause for Byrd's state arrest and rejected his contention that the resulting searches and federal interview required suppression. Mar. 22, 2017 Hr'g Tr. at 40, 43–44, 76–81, 117.

On March 29, 2017, Byrd moved to represent himself. Crim. D.E. 83. After conducting a colloquy pursuant to *Faretta v. California*, 422 U.S. 806 (1975), the Court found that Byrd knowingly and voluntarily waived his right to counsel, permitted him to proceed *pro se*, and directed that standby counsel be appointed. Crim. D.E. 89 ("Order Granting Motion to Proceed Pro Se"); Crim. D.E. 264 ("Apr. 13, 2017 Hr'g Tr.").

Over the next two years, Byrd repeatedly sought additional discovery, reconsideration of the suppression rulings, a *Franks* hearing, and recusal. *See, e.g.*, Crim. D.Es. 100, 114, 122, 126, 134, 141, 162, and 164. Those filings generally returned to the same theories: that the state lacked probable cause to arrest Byrd, state and federal authorities had improperly coordinated their investigations, investigative records had been falsified, and redactions concealed evidence supporting those theories. *See generally id.* After Byrd filed successive motions to reconsider the suppression rulings, the Court ordered that he could not file additional motions raising previously addressed suppression issues without first obtaining leave. Crim. D.E. 120. In April 2018, the Court denied Byrd's motions seeking additional discovery, dismissal of the indictment, and judicial disqualification. Crim. D.E. 143. In November 2018, the Court denied Byrd leave to pursue another *Franks* hearing and suppression motion, concluding that he again sought to relitigate previously decided matters and had presented no new evidence undermining the probable cause determination. Crim. D.Es. 166 & 167.

As trial approached, Byrd also sought additional *Brady* and *Giglio* material, unredacted investigative communications, exclusion of the cartridge casing recovered after the Malaga robbery, limitations on testimony by Vineland officers, and exclusion or further testing of the Government's cell site evidence. Crim. D.Es. 181, 190. On March 28, 2019, the Court denied Byrd's motion in limine and motion to dismiss and dismissed his *Brady* motion as moot. Crim. D.E. 198 ("Mar. 28, 2019 Order").

Shortly before trial, the Government produced discovery materials concerning Charles Sanders, Byrd's accomplice in the July 19 Vineland robbery, who later became a Government witness. Crim. D.E. 220 ("Apr. 9, 2019 Trial Tr.") at 107–73; Crim. D.E. 232 ("Apr. 1, 2019 Trial Tr.") at 3–9. Those materials included Sanders's 2015 proffer, in which Sanders placed himself—

not Byrd—in the vehicle with Bailey and Jones during the Bogan shooting, and identified Byrd as his accomplice in the Vineland bank robbery. Crim. D.E. 242-53 ("October 5, 2015 FBI Report") at 1–3. Byrd maintained that Sanders's proffer supported his theory that Sanders and others associated with the Bogan shooting (and not him) had participated in the bank robberies. Apr. 1, 2019 Trial Tr. at 3–9. Byrd also sought additional time to review the volume of Jencks material he had received, but the Court denied his request for a continuance. Crim. D.E. 261 ("Mar. 28, 2019 Hr'g Tr.") at 20–22.

A final pretrial dispute arose from a March 26, 2019 search of Byrd's housing unit at the Federal Detention Center ("FDC") in Philadelphia. Crim. D.E. 193 ("Mar. 26, 2019 Letter"); Mar. 28, 2019 Hr'g Tr. at 3–19. Byrd maintained that prison personnel removed two discovery thumb drives and a folder containing his trial materials, while Bureau of Prisons ("BOP") personnel maintained that the search uncovered prohibited thumb drives and pornography and that Byrd's permissible legal materials were returned to him. Mar. 28, 2019 Hr'g Tr. at 3–19. At a hearing two days later, FDC attorney Marisa Nash testified that prosecutors had not examined the confiscated thumb drives. *Id.* The Court sealed the drives, and standby counsel agreed to reproduce their permissible contents for Byrd. *Id.* Byrd later alleged that Nash had entered his cell and photographed his legal papers and requested surveillance footage and Nash's telephone records. Crim. D.E. 199 ("Mar. 29, 2019 Letter") at 3–4.

### *2. Trial*

Trial began on April 1, 2019. Apr. 1, 2019 Trial Tr. Byrd represented himself at the outset, with Troy Archie serving as standby counsel. *Id.* During trial, Byrd asked that Archie assume his representation, and Archie thereafter acted as trial counsel. Crim. D.E. 205.

The Government presented evidence connecting Byrd to each of the three robberies. As to the Mays Landing robbery, a bank teller identified Byrd at trial, and Byrd's then girlfriend (who worked at the bank) and a coworker both testified that they recognized Byrd from the bank surveillance images circulated after the robbery. Crim. D.E. 224 ("Apr. 2, 2019 Trial Tr.") at 105, 121, 130–31. As to the Vineland robbery, Sanders identified Byrd as his armed accomplice and described their planning, disguises, entry into the bank, and escape. Apr. 9, 2019 Trial Tr. at 107–31. Archie cross-examined Sanders at length concerning his inconsistent statements, criminal history, cooperation agreement, presence at the Bogan shooting, relationship with Bailey, and possible motives to implicate Byrd. *Id.* at 131–67.

The Government also presented physical and forensic evidence from the Vineland and Malaga robberies. DNA testing of evidence recovered during the Malaga investigation (a cutting from a head wrap) identified Byrd as its source. Crim. D.E. 219 ("Apr. 8, 2019 Trial Tr.") at 107–13, 138–41. Testing of a mask recovered after the Vineland robbery also identified Byrd as the source of DNA profiles, and other evidence from the Vineland robbery included DNA attributable to Sanders and a weaker mixed profile from a shirt recovered after that robbery. *Id.* at 131–38. The Government also introduced evidence concerning a .380 caliber cartridge casing recovered near the Malaga robbery scene that was obtained when investigators returned to the area approximately two months after the robbery. Crim. D.E. 225 ("Apr. 3, 2019 Trial Tr.") at 55–63, 67–75.

The Government also introduced Byrd's recorded October 1, 2014 interview with federal agents during which he made admissions concerning the bank robberies and acknowledged carrying a firearm. Apr. 10, 2019 Trial Tr. at 20–21, 96–97. Byrd elected to testify and disputed

the Government's account of the case, including by asserting that the Bogan charge and his resulting state custody had been used improperly to build the federal robbery case. *Id.* at 38–101.

The jury found Byrd guilty on all seven counts. Crim. D.E. 217 ("Verdict").

*3. Post-trial litigation and sentencing*

After trial, Archie filed a notice of motion for a new trial under Federal Rule of Criminal Procedure 33.[2] Crim. D.E. 218. The Court thereafter granted Byrd's request to remove Archie as counsel and appointed Teri Lodge. Crim. D.E. 227. Because Archie had filed only a notice of motion before being relieved, the Court denied that initial Rule 33 motion without prejudice. Crim. D.E. 229.

On January 5, 2021, Lodge filed a renewed Rule 33 motion supported by extensive exhibits. Crim. D.E. 242-1 ("Rule 33 Motion"). Lodge principally challenged: (1) Byrd's arrest and detention and the resulting suppression rulings; (2) alleged improper coordination between state and federal authorities; (3) the Government's reliance on the Sanders proffer and evidence concerning alternative suspects; (4) aspects of the DNA evidence and the delayed recovery of the Malaga cartridge casing; and (5) asserted prosecutorial misconduct. *See generally id.* The Government opposed the motion, and Lodge filed a reply. Crim. D.E. 249 ("Rule 33 Opposition"); Crim. D.E. 252 ("Rule 33 Reply").

On August 17, 2021, the Court heard argument on the Rule 33 Motion and thereafter denied the motion. Crim. D.E. 263 ("Aug. 17, 2021 Hr'g Tr.") at 2–20. The Court then sentenced Byrd

[2] Federal Rule of Criminal Procedure 33 permits a court, on a defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A motion based on grounds other than newly discovered evidence generally must be filed within fourteen days after the verdict. Fed. R. Crim. P. 33(b)(2).

to an aggregate term of 548 months' imprisonment. Aug. 17, 2021 Hr'g Tr. at 20–166; Crim. D.E. 257 ("Judgment") at 3.

### C. Direct Appeal and Section 2255 Proceedings

Lodge represented Byrd on direct appeal of his conviction and sentence. She challenged probable cause for the state arrest, Byrd's continued detention, the admission of his confession and physical evidence, alleged collusion between state and federal authorities, the Government's treatment of the Sanders proffer, asserted *Brady* and Jencks Act violations, prosecutorial misconduct, the redaction of investigative communications, the denial of in camera review, and compulsory process for proposed defense witnesses. *See United States v. Byrd*, No. 21-2613 (3d Cir. Nov. 15, 2021) ("Direct Appeal"), Direct Appeal D.E. 15 ("Appellant Brief"); Direct Appeal D.E. 44 ("Appellant Reply"). The Third Circuit affirmed the judgment of conviction. *See* Appellate Opinion.

Byrd, now proceeding *pro se*, timely filed the present § 2255 Motion. Although his handwritten submission is lengthy and overlapping, the Government reasonably construed it as asserting fifteen grounds. *See* Answer. The Court follows those ground numbers so that Byrd can identify the disposition of each claim, but groups the claims by their procedural and analytical treatment.

## II. LEGAL STANDARDS

### A. Section 2255, Relitigation, and Procedural Default

Section 2255 permits a federal prisoner to seek relief when a sentence was imposed in violation of the Constitution or federal law, the sentencing court lacked jurisdiction, the sentence exceeded the statutory maximum, or the judgment is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). Relief is reserved for constitutional or jurisdictional errors and other

fundamental defects resulting in a complete miscarriage of justice. *See United States v. Addonizio*, 442 U.S. 178, 185 (1979).

A § 2255 motion ordinarily may not relitigate an issue resolved on direct appeal. *United States v. DeRewal*, 10 F.3d 100, 105 n.4 (3d Cir. 1993). A substantive claim that could have been raised on direct appeal—but was not—is procedurally defaulted unless the movant establishes cause and actual prejudice, or actual innocence. *Bousley v. United States*, 523 U.S. 614, 622–23 (1998). Constitutionally ineffective assistance may supply cause, but only if the movant satisfies the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).[3] *United States v. Mannino*, 212 F.3d 835, 840 (3d Cir. 2000). An ineffective assistance claim itself ordinarily may be raised for the first time under § 2255. *Massaro v. United States*, 538 U.S. 500, 504 (2003).

The Court must hold an evidentiary hearing unless the § 2255 motion and the existing record conclusively establish that the movant is not entitled to relief. 28 U.S.C. § 2255(b). Put differently, a hearing is unnecessary where the allegations are contradicted by the record, are legally insufficient, or would not entitle the movant to relief, even if accepted. *United States v. Booth*, 432 F.3d 542, 545–46 (3d Cir. 2005).

**B. Ineffective Assistance of Counsel**

Byrd argues that Lodge, his counsel following his trial and on Direct Appeal, was ineffective. To establish ineffective assistance, Byrd must show both that: (1) counsel's performance was objectively unreasonable and (2) that the deficiency caused prejudice. *Strickland*, 466 U.S. at 687–88. Courts review counsel's performance deferentially and from counsel's perspective at the time. *Id.* at 689. The Court may deny a claim of ineffective assistance if a movant fails to establish either element. *Id.* at 697.

[3] *See infra* II.B.

Appellate counsel is not required to raise every nonfrivolous issue; counsel may winnow weaker arguments and select those most likely to succeed. *Jones v. Barnes*, 463 U.S. 745, 751–54 (1983). An omission is generally deficient only when the omitted argument was clearly stronger than those presented and no reasonable strategic basis supported the choice to omit it. *Mannino*, 212 F.3d at 844–45. Omitting a meritless claim or failing to anticipate a later change in the law does not render counsel ineffective. *United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999).

Prejudice requires a reasonable probability that the appeal would have produced a different result had counsel raised the omitted issue. *Mannino*, 212 F.3d at 845. Thus, the strength of the omitted claim and the standard of appellate review are central to the Court's *Strickland* inquiry.

### C. Disclosure Obligations Under *Brady*, *Giglio*, and the Jencks Act

Under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Government must disclose evidence favorable to the accused that is material either to guilt or punishment. A *Brady* violation requires a showing that: (1) the evidence was favorable to the defense because it was exculpatory or impeaching; (2) the Government suppressed the evidence; and (3) the evidence was material. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Evidence is material when there is a reasonable probability that, had it been disclosed, the result of the proceeding would have been different. *Kyles v. Whitley*, 514 U.S. 419, 433–34 (1995); *Giglio v. United States*, 405 U.S. 150, 154 (1972) (applying *Brady*'s disclosure rule to material impeachment evidence).

The Jencks Act imposes a separate statutory obligation concerning prior statements of Government witnesses. *See* 18 U.S.C. § 3500(b). Unlike *Brady*, the Jencks Act generally requires production only after the witness has testified on direct examination. *Id.* Where Byrd invokes both doctrines, the Court addresses each according to its own requirements.

## III. THE § 2255 MOTION

Byrd raises fifteen grounds for relief, many of which overlap factually and legally. Rather than address the grounds sequentially, the Court groups them by the legal framework governing their disposition.

The Court first addresses Grounds Two, Three, Eleven, Thirteen, and Fourteen, which rest wholly or substantially on issues Byrd litigated in his Direct Appeal. The Court then considers Grounds One, Four through Ten, and Twelve, which fault Lodge for not raising additional issues on Direct Appeal. Finally, the Court resolves Ground Fifteen's broader conspiracy and Universal Declaration of Human Rights theory. Because none of Byrd's fifteen grounds warrants relief under § 2255, the Motion will be **DENIED**.

### A. Claims Raised or Resolved on Direct Appeal

Grounds Two, Three, Eleven, Thirteen, and much of Ground Fourteen repackage matters litigated on Direct Appeal. Those underlying substantive issues may not be relitigated here. *See DeRewal*, 10 F.3d at 105 n.4 ("refus[ing] to permit" relitigation of issues rejected on direct appeal in a § 2255 motion). That bar, however, does not prevent Byrd from asserting that Lodge rendered ineffective assistance on appeal. *See Massaro*, 538 U.S. at 504. Thus, to the extent Lodge actually raised an issue and the Third Circuit decided it, Byrd may not obtain a second merits determination of the underlying claim by repackaging it as part of his § 2255 Motion. However, Byrd's claims that Lodge was ineffective in selecting, omitting, or presenting appellate issues remain independently reviewable under *Strickland*.

With that distinction in mind, the Court first addresses the specific grounds that substantially repeat issues resolved on Direct Appeal and then concludes by considering Ground Fourteen, which incorporates many of those same issues along with several additional rulings.

*1. Ground Two: Suppression proceedings and allegedly withheld evidence*

In Ground Two, Byrd alleges that he was constructively denied counsel during multiple pretrial proceedings and at trial because the Government allegedly withheld exculpatory evidence bearing on his state arrest, the ensuing searches, and his confession. Mot. at 13–27. He argues that the withheld evidence would have undermined probable cause, exposed improper coordination between state and federal investigators, and altered the suppression proceedings. He also challenges Lodge's handling of those issues on Direct Appeal.

Those underlying suppression and misconduct theories were already considered by the Third Circuit in Byrd's Direct Appeal and cannot be relitigated here. Specifically, on Direct Appeal, Lodge argued that Byrd's state arrest lacked probable cause, that his continued detention became unlawful after investigators obtained exculpatory information, that state and federal officers improperly coordinated their investigations to obtain his confession, that his confession and the physical evidence recovered from his home and car should have been suppressed, and that prosecutors withheld evidence bearing on those issues. Appellant Brief at 25–52.

The Third Circuit rejected those arguments. It held that Chicana Brown's account that Byrd was in the car and supplied Bailey with the gun used to shoot Bogan—an account corroborated in part by details consistent with Bogan's statement—supplied probable cause for Byrd's state arrest, and that the later statements and employment records on which Byrd relied did not dissipate probable cause because they did not foreclose Brown's allegation that Byrd supplied the firearm used in the Bogan shooting. Appellate Opinion at *2. It also rejected Byrd's claim that his state detention was a collusive device used to evade federal protections, found no reversible error in the admission of the confession and physical evidence, and rejected his broader *Brady* and Jencks Act theories. *Id.* at *2–3.

Byrd cannot obtain another merits determination of those claims by relabeling the alleged nondisclosures and suppression errors as a "constructive denial" of counsel. He identifies no independent constitutional injury apart from the alleged lack of probable cause, unlawful detention, collusion, nondisclosure, and erroneous suppression rulings already presented to the Third Circuit. *See DeRewal*, 10 F.3d at 105 n.4 (refusing to permit relitigation of suppression and evidentiary issues resolved on direct appeal).[4]

Byrd's separate claim that Lodge rendered ineffective assistance on appeal remains cognizable, but it fails on the merits. Lodge did not omit the substance of Ground Two. She devoted substantial portions of the Direct Appeal to the arrest, detention, alleged state and federal coordination, suppression of the confession and physical evidence, and asserted disclosure violations. *See* Appellant Brief at 25–52. Byrd identifies no material fact, legal authority, or materially stronger formulation that Lodge failed to present and that creates a reasonable probability of a different appellate result. He therefore establishes neither deficient performance nor prejudice. The substantive claims encompassed by Ground Two are **DISMISSED** as barred from relitigation, and the ineffective assistance claim against Lodge is **DENIED.**

*2. Ground Three: Redacted investigative communications*

In Ground Three, Byrd alleges that the Government's redaction of names and other information from communications among federal, state, and local investigators prevented him from identifying and calling witnesses who could have supported his theories of improper law enforcement collusion and a false attempted murder charge. Mot. at 28–30. He further contends

[4] To the extent Byrd invokes *United States v. Cronic*, prejudice is presumed only in narrow circumstances involving the denial of counsel at a critical stage, counsel's complete failure to subject the prosecution's case to adversarial testing, or circumstances in which even competent counsel could not provide effective assistance. 466 U.S. 648, 659–60 (1984). Byrd alleges instead that nondisclosure impaired the defense. That is not a constructive denial of counsel under *Cronic*.

that Lodge rendered ineffective assistance by failing to raise the resulting due process and compulsory process violations on Direct Appeal.

The underlying claims Byrd asserts in Ground Three were already litigated on Direct Appeal. Lodge argued that the District Court violated Byrd's due process and compulsory process rights by restricting his proposed witnesses and separately abused its discretion by declining to inspect the redacted law enforcement emails in camera. Appellant Brief at 55–59. Those arguments encompassed the substance of Byrd's present theory: that the redactions prevented him from discovering evidence supporting his collusion theory and identifying favorable witnesses.

The Third Circuit rejected both arguments. It held that Byrd had not made a "plausible showing" that in camera review would uncover material evidence because he merely speculated that the redactions concealed evidence of collusion. Appellate Opinion at *3. It likewise rejected his compulsory process claim because he had not established the relevance of the proposed testimony concerning law enforcement collusion or the Bogan shooting, and his theory that the shooting evidence would establish misidentification in the robberies was "at best speculative." *Id.* Byrd cannot relitigate those determinations through § 2255. *DeRewal*, 10 F.3d at 105 n.4. However, his ineffective assistance theory, which he can litigate here, fares no better. Lodge raised the substance of these claims on Direct Appeal, and the Third Circuit rejected them on their merits. Byrd identifies no materially stronger argument or omitted evidence that creates a reasonable probability of a different appellate result. Accordingly, the substantive due process, compulsory process, and in camera review claims in Ground Three are **DISMISSED** as barred from relitigation, and the ineffective assistance claim is **DENIED**.

### 3. *Ground Thirteen: Sanders's proffer and timing of disclosure*

In Ground Thirteen, Byrd alleges that the Government possessed Sanders's October 2015 proffer for years,[5] but disclosed a summary of it and other Jencks material only shortly before trial. Byrd contends that Sanders's statement: (1) showed that Byrd was not present for the Bogan shooting, (2) provided impeachment material concerning Sanders, (3) supported a third-party guilt theory, and (4) should have been disclosed earlier under *Brady*, *Giglio*, and the Jencks Act. Mot. at 81–85; Byrd Cert. IV at 1–10.

The substantive disclosure theories were already litigated. Lodge first presented the Sanders nondisclosure theory in the Rule 33 Motion and argued that the Government's failure to disclose the Sanders proffer earlier impaired Byrd's investigation and development of his third-party guilt defense. *See* Rule 33 Motion at 98–102. She then renewed those arguments on Direct Appeal, again challenging both the materiality and timing of the Sanders disclosure. Appellant Brief at 43–52; Appellant Reply at 10–16.

The Third Circuit rejected those arguments. To the extent Byrd relied on Sanders's statement to undermine probable cause for his state arrest, the court held that Sanders's statement did not negate Brown's separate allegation that Byrd supplied the firearm used in the shooting (even if Sanders's account showed that Byrd was not present for the Bogan shooting). Appellate Opinion at *3. The court separately held that Sanders's statement was not material to Byrd's guilt or punishment for the charged bank robberies. *Id.* It also held that Byrd's broader assertions that prosecutors failed to disclose *Brady* evidence and produced Jencks material shortly before trial were unsupported. *Id.* at *3 n.5.

---

[5] Sanders's 2015 proffer placed Sanders, Bailey, and Jones—not Byrd—in the vehicle during the Bogan shooting, while separately identifying Byrd as Sanders's accomplice in the July 19 Vineland bank robbery. Oct. 5, 2015 FBI Report at 1–3.

As with Grounds Two and Three, Byrd cannot obtain another merits determination of those substantive disclosure claims through this § 2255 Motion. *DeRewal*, 10 F.3d at 105 n.4. Nor does recasting the same allegations as ineffective assistance establish a basis for relief. As noted above, Lodge did not omit the Sanders issue, and, in fact, she litigated the alleged delayed disclosure both in the Rule 33 proceedings and on Direct Appeal.

The trial record further undermines Byrd's contention that the timing of the disclosure deprived him of a meaningful opportunity to use the Sanders material. Before jury selection, Byrd explained his theory that Sanders's account of the Bogan shooting undermined the Government's case and suggested that Sanders had transferred details from that shooting to his account of the bank robberies. Apr. 1, 2019 Trial Tr. at 5–9. At trial, the defense used Sanders's prior statements and his admitted presence in the vehicle during the Bogan shooting to challenge his credibility. Apr. 9, 2019 Trial Tr. at 132–38.

To be sure, the Court's conclusion does not rest solely on the fact that the disclosure occurred before trial. Instead, the critical point is that the disclosure occurred in time for the defense to make effective use of the information at trial. *See United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983) (explaining that due process is satisfied when favorable evidence is disclosed in time for its effective use at trial). Here, the record demonstrates such use. Because Lodge specifically challenged both the timing of the disclosure and its asserted consequences, Byrd identifies no materially stronger argument or omitted evidence creating a reasonable probability of a different appellate result.

Accordingly, the substantive *Brady*, *Giglio*, and Jencks Act claims in Ground Thirteen are **DISMISSED** as barred from relitigation, and the ineffective assistance claim against Lodge is **DENIED**.

*4. Ground Eleven: "Honest Services" fraud and probable cause*

In Ground Eleven, Byrd alleges that Lodge rendered ineffective assistance by failing to argue that Judge Kugler committed an "honest services" violation by repeatedly finding probable cause for Byrd's state arrest in connection with the Bogan shooting. Mot. at 69–74.

Byrd's "honest services" theory fails as a matter of law. 18 U.S.C. § 1346 defines a "scheme or artifice to defraud" for purposes of the federal mail and wire fraud statutes to include a scheme to deprive another of the intangible right of "honest services." The Supreme Court has limited that provision to bribery and kickback schemes. *See Skilling v. United States*, 561 U.S. 358, 408–09 (2010) (holding that § 1346 reaches only schemes involving bribes or kickbacks and therefore did not encompass conduct involving neither). Byrd alleges neither. An allegedly erroneous judicial ruling—even one Byrd believes was knowingly wrong—does not itself constitute honest services fraud under § 1346. Lodge therefore was not ineffective for declining to present that meritless theory on appeal.

Construed liberally as another challenge to the probable cause supporting Byrd's state arrest and continued detention, Ground Eleven presents issues already resolved on Direct Appeal. As noted above, Lodge argued that Chicana Brown's statement did not establish probable cause, that later information revealed during discovery (*e.g.*, Byrd's employment records) eliminated any probable cause that may initially have existed, and that Byrd's resulting detention, confession, and the evidence obtained during the investigation were unlawful. Appellant Brief at 26–37. She also argued that prosecutors continued to rely on probable cause while withholding Sanders's statement concerning the Bogan shooting. *Id.* at 49–52. Thus, Lodge presented the substance of the probable cause challenge that underlies Ground Eleven.

The Third Circuit rejected those arguments. *See supra* III.A.1 (discussing Appellate Opinion at *2–3).

In sum, to the extent Ground Eleven again challenges the probable cause supporting Byrd's state arrest and continued detention, those substantive claims are **DISMISSED** as barred from relitigation. Byrd's ineffective assistance claim against Lodge is **DENIED** because the omitted honest services theory lacked merit and Lodge actually presented the underlying probable cause arguments on direct appeal.

*5. Ground Fourteen: Prior orders, Byrd's confession, and cumulative error*

Ground Fourteen serves as a catchall challenge to numerous Court rulings that Byrd contends Lodge should have challenged on Direct Appeal. Mot. at 86–94. Among other things, Byrd identifies: (1) the March 2017 rulings denying his suppression and discovery motions; (2) the ensuing rulings denying repeated reconsideration of the probable cause, detention, and suppression issues; (3) the 2018 rulings concerning additional discovery, judicial disqualification, subpoenas, disqualification of the prosecutor, a *Franks* hearing, and renewed suppression; (4) the March 2019 rulings concerning *Brady* material, evidentiary issues, and alleged prosecutorial misconduct; and (5) the denial of his Rule 33 Motion. *Id.* at 91–94. He argues that those rulings collectively violated due process and equal protection and that Lodge rendered ineffective assistance by failing to challenge each one.

Byrd emphasizes that he could raise his ineffective assistance claim for the first time under § 2255. Mot. at 94; *see Massaro*, 538 U.S. at 504. He is correct. That rule, however, permits review of Lodge's performance; it does not reopen the substantive claims that Lodge actually presented and the Third Circuit rejected. *See DeRewal*, 10 F.3d at 105 n.4.

The rulings Byrd incorporates into Ground Fourteen fall into three categories.

*First*, many concern the probable cause, detention, suppression, disclosure, misconduct, discovery, and compulsory process theories that Lodge actually raised on Direct Appeal. Specifically, Lodge challenged the probable cause for Byrd's state arrest, his continued detention, alleged collusion between state and federal authorities, and the admission of his confession and physical evidence. Appellant Brief at 25–43. She also argued that the Government improperly withheld and delayed disclosure of the Sanders proffer, asserting *Brady* and Jencks Act violations and prosecutorial misconduct. *Id.* at 43–52; Appellant Reply at 10–16. She further challenged the restrictions on Byrd's proposed defense witnesses and the refusal to inspect the redacted investigative communications in camera. Appellant Brief at 55–58. Those arguments encompassed the substance of many of the underlying motions and orders Byrd now lists separately, including his repeated suppression and reconsideration motions, discovery disputes, and allegations of prosecutorial misconduct. See Appellate Opinion at *2–3. Accordingly, Byrd cannot relitigate those substantive claims by identifying each antecedent motion or order separately in Ground Fourteen. *See DeRewal*, 10 F.3d at 105 n.4. Section 2255 does not afford a second merits determination simply because Byrd now organizes the same claims around the individual rulings that preceded the appeal.

*Second*, several of the rulings Byrd identifies correspond to claims addressed independently elsewhere in this Opinion. The judicial disqualification ruling Byrd identifies in Ground Fourteen is the subject of Ground Eight. His allegations that investigators falsified documents and supplied false information in support of probable cause are addressed in Ground Four. The § 922(g)(1) issue presented in the Rule 33 Motion is addressed in Ground Nine. His challenges concerning the Sanders proffer and the Rule 33 proceedings are addressed in Ground Thirteen, and the March 2019 ruling concerning the delayed recovery and admission of

the cartridge casing is addressed in Ground Twelve. Those rulings do not supply an additional basis for relief merely because Byrd incorporates them again into Ground Fourteen.

*Third*, the remaining Court rulings are not developed into distinct constitutional claims. To the extent Byrd relies on the Court's orders granting the Government's motion to quash subpoenas Byrd served on the Vineland Police Department, denying his motion to disqualify a prosecutor, or denying his March 2019 motion to dismiss for alleged misleading grand jury testimony and prosecutorial misconduct, those rulings merely repackaged the witness access, collusion, and prosecutorial misconduct theories addressed above. Ground Fourteen does not identify any distinct constitutional right violated by those rulings or explain how any asserted error affected his conviction or appeal. Merely incorporating prior filings or identifying adverse docket entries does not supply the missing factual and legal basis for relief. *See United States v. Thomas*, 221 F.3d 430, 437 (3d Cir. 2000) (recognizing that vague and conclusory allegations in a § 2255 motion may be disposed of without further investigation). Nor do Byrd's generalized references to due process and equal protection transform those rulings into cognizable constitutional violations. Thus, the balance of the rulings incorporated into Ground Fourteen either repeats claims resolved on Direct Appeal, overlaps with claims addressed elsewhere in this Opinion, or is not developed into a distinct constitutional claim warranting § 2255 relief.

That leaves Byrd's claim that Lodge was constitutionally required to appeal every adverse ruling he identified. Byrd is incorrect: appellate counsel has no constitutional duty to raise *every* nonfrivolous issue requested by a defendant. *Jones*, 463 U.S. at 751–54. To the contrary, effective appellate advocacy ordinarily requires "winnowing out weaker arguments on appeal" and concentrating on the issues counsel considers most likely to succeed. *Id.* at 751–52. The correspondence attached to Byrd's Reply reflects precisely that process: Byrd urged Lodge to

pursue numerous additional issues, while Lodge explained the governing appellate standards and page limitations and told Byrd that she had selected the claims she considered strongest. Reply at 58–66. The appellate record supports that choice. Lodge presented the central suppression, misconduct, discovery, and compulsory process theories at length, while the omitted theories either fail for the reasons explained elsewhere in this Opinion or are not developed into viable constitutional claims. Nothing in Ground Fourteen shows that Lodge acted unreasonably by declining to add those issues to an already substantial appeal. Byrd therefore has not shown deficient performance or a reasonable probability that adding any of those issues would have changed the result of his appeal.

Nor can Byrd obtain relief by aggregating the claims. Cumulative error review considers whether multiple constitutional errors—although individually harmless—collectively rendered the proceeding fundamentally unfair. *See Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007). The doctrine requires multiple underlying constitutional errors—*i.e.*, it does not permit claims that do not individually constitute error to become errors merely because they are considered together. Because Byrd has established no underlying errors to aggregate, his cumulative error theory fails.

Accordingly, to the extent Ground Fourteen reasserts substantive claims resolved on direct appeal, those claims are **DISMISSED** as barred from relitigation. The ineffective assistance and cumulative error components of Ground Fourteen are **DENIED.**

* * *

In sum, the Court **DISMISSES** the substantive claims in Grounds Two, Three, Eleven, Thirteen, and the corresponding portions of Ground Fourteen to the extent they seek to relitigate issues that the Third Circuit already considered and rejected on direct appeal. The Court **DENIES** the associated ineffective assistance claims because Lodge either presented the underlying issues

on appeal or reasonably omitted meritless or weaker arguments, and Byrd has not shown a reasonable probability that additional arguments would have changed the result. The Court likewise **DENIES** Ground Eleven's independent honest services theory and Ground Fourteen's cumulative error theory because neither establishes a constitutional basis for relief.

### B. Claims Omitted from Direct Appeal

The Court now turns to the grounds that rest on issues Lodge did not raise on Direct Appeal: Grounds One, Four through Ten, and Twelve. The underlying substantive claims, raised now for the first time, are procedurally defaulted unless Byrd establishes cause and actual prejudice or actual innocence. *See Bousley*, 523 U.S. at 622–23. Because Byrd invokes Lodge's alleged ineffective assistance as cause, the relevant question is whether Lodge was constitutionally ineffective for omitting each issue. To establish ineffective assistance based on an omitted issue, Byrd is required to show that the omitted issue was clearly stronger than those Lodge presented on Direct Appeal and that there is a reasonable probability the result of the appeal would have been different had she raised the omitted issue. *See Mannino*, 212 F.3d at 845. As shown below, Byrd cannot make that showing.

#### *1. Ground One: BOP cell search and defense materials*

Ground One concerns the March 26, 2019 search of Byrd's housing unit at the FDC in Philadelphia. Byrd alleges that: FDC personnel confiscated legal and strategy materials shortly before trial; BOP attorney Marisa Nash reviewed those materials and communicated with the prosecutor; Nash later entered his cell and photographed additional legal papers; and the intrusion impaired his ability to represent himself. Mot. at 5–12. Based on these events, Byrd asserts violations of the Fourth Amendment (based on the search and seizure of materials from his cell)

and the Sixth Amendment (based on the alleged intrusion into confidential defense materials). He further contends that Lodge was ineffective for omitting those constitutional claims.

The Fourth Amendment theory fails. "The Fourth Amendment right to privacy, to be free from unreasonable searches, is fundamentally inconsistent with incarceration." *Doe v. Delie*, 257 F.3d 309, 316 (3d Cir. 2001). Decades ago, the Supreme Court held that routine room searches of pretrial detainees are reasonable security measures, even assuming detainees retain some diminished expectation of privacy after entering a custodial facility. *Bell v. Wolfish*, 441 U.S. 520, 555–57 (1979). The Court later held that a prisoner has no reasonable expectation of privacy in a prison cell. *Hudson v. Palmer*, 468 U.S. 517, 525–30 (1984). The March 26 unit-wide contraband search therefore did not violate the Fourth Amendment.

The Court's inquiry into Byrd's Sixth Amendment claim is different. Government intrusion into confidential defense materials may violate the Sixth Amendment when confidential defense strategy is disclosed to prosecutors or the intrusion otherwise prejudices the defense. *Weatherford v. Bursey*, 429 U.S. 545, 554–58 (1977). For example, in *United States v. Levy*, the Third Circuit presumed prejudice after confidential defense strategy was actually transmitted to the authorities responsible for investigating and prosecuting the defendant. 577 F.2d 200, 208–10 (3d Cir. 1978). Whatever the precise scope of that presumption may be, a defendant must offer more than speculation that confidential information *might* have reached the prosecution.

Here, the record does not establish disclosure of confidential information. At the March 28, 2019 hearing, Nash testified that the March 26 search was a unit-wide "mass shakedown" in which every cell was searched, and that she did not participate in it. Mar. 28, 2019 Hr'g Tr. at 3. She explained that inmates were not permitted to possess thumb drives at the FDC, and that officers recovered two thumb drives from Byrd's cell. *Id.* at 4–5. She later reviewed both drives and

determined that they contained materials related to Byrd's criminal case; one also contained pornographic images. *Id.* at 6, 11–12. Nash further testified that she was unaware of anyone else at the FDC having reviewed the drives and that the Government had not reviewed them in preparation for the hearing. *Id.* at 13. Her documented March 27 telephone contact with Assistant United States Attorney Jason Richardson concerned Byrd's claim that an expandable folder of trial materials was missing: Nash stated that she would contact the officer who conducted the search and attempt to locate it. Crim. D.E. 243 ("Mar. 27, 2019 Hr'g Tr.") at 3–11, 35–37. The Court thereafter maintained the drives under seal, and Archie confirmed that he would duplicate their contents for Byrd without the pornography. Mar. 28, 2019 Hr'g Tr. at 17–19.

On March 29, 2019, Byrd wrote a letter to the Court separately alleging that Nash entered his cell the preceding day and photographed legal papers. Mar. 29, 2019 Letter at 3–4. Although the letter asserted that FDC witnesses had observed Nash, the letter identified no witness by name, included no witness statement or other corroborating record, did not identify the material allegedly photographed, and did not connect any information from the cell to a prosecutorial action or trial decision. Even assuming Nash entered Byrd's cell and photographed his legal papers, the record does not show that any confidential defense strategy reached the prosecution. Nor does Byrd identify any specific trial preparation he was unable to complete after standby counsel reproduced the permissible materials or any other concrete impairment of his defense.

Lodge's omission of this argument from the Direct Appeal was therefore neither deficient nor prejudicial, and, in turn, it cannot supply cause to excuse the procedural default of Byrd's underlying Fourth and Sixth Amendment claims. Those claims are **DISMISSED** as procedurally defaulted, and the ineffective assistance claim is **DENIED**.

2. *Ground Four: Allegedly falsified investigative documents*

In Ground Four, Byrd alleges that state and federal officers falsified investigative documents, principally a July 16, 2014 Vineland call detail report listing his silver Honda Accord and license plate, which Byrd interprets as placing his vehicle at the scene of the Bogan shooting. Mot. at 31–34. Byrd argues that employment records and other evidence showed that he and his vehicle were at his workplace when Bogan was shot, and that officers used the allegedly false entry to arrest him, seize his phone and car, and develop the federal robbery case. *Id.* He further contends that appellate counsel was ineffective for failing to obtain relief on this theory. *Id.*

To the extent Byrd contends that the allegedly fabricated entry infected the probable cause determinations supporting his arrest and the later searches, the Court construes the claim under *Franks v. Delaware*, 438 U.S. 154 (1978). A *Franks* claim requires proof that (1) the affiant knowingly and deliberately, or with reckless disregard for the truth, made a false statement or omission that created a falsehood in applying for a warrant; and (2) the false statement or omission was material to the probable cause determination. *Franks*, 438 U.S. at 171–72; *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (setting forth the *Franks* inquiry).

Byrd cannot establish either *Franks* requirement. *First*, the record does not support his premise that officers deliberately or recklessly falsified the call detail report. Nor has Byrd established the predicate factual premise that the report actually placed his Honda at the shooting. When Byrd presented the report at the September 28, 2017 reconsideration hearing, the Court questioned his assumption that the appearance of his license plate on the call detail report meant his vehicle had been present at the Bogan shooting. Crim. D.E. 113 ("Sept. 28, 2017 Reconsideration Hr'g Tr.") at 19–21. The Court repeatedly asked Byrd to identify any police report, arrest document, or warrant that relied on his vehicle's presence at the shooting. He

identified none and acknowledged that Chicana Brown's statement regarding the shooting did not mention his car. *Id.* at 22–23.

*Second*, again assuming the appearance of Byrd's Honda and license plate on the July 16 call detail report was inaccurate, that information was not material to any relevant probable cause determination. Byrd's state arrest rested on Brown's account that Byrd supplied the firearm used in the Bogan shooting—not on an assertion that Byrd or his Honda was present when the shooting occurred. The Third Circuit already held that Brown's account supplied probable cause and that Byrd's employment records did not undermine the separate allegation that he supplied the firearm. Appellate Opinion at *2. Neither the State Search Warrant and Affidavit nor the Federal Search Warrant and Affidavit relied on Byrd's car having been present at the shooting. *See* State Search Warrant and Affidavit; Federal Search Warrant and Affidavit. At the suppression hearing, the Court expressly stated that it had not relied on the disputed call detail sheet in finding probable cause. Mar. 22, 2017 Hr'g Tr. at 117. Thus, even if the entry was inaccurate, removing it would not have altered any relevant probable cause determination.

The Direct Appeal further undermines Byrd's ineffective assistance claim. Lodge did not ignore Byrd's falsification theory. She argued that police had falsified an arrest report to include information concerning Byrd's car. However, the Third Circuit rejected that contention as "unsupported and unpersuasive." Appellate Opinion at *2 n.4. The narrower theory Byrd advances now—focused specifically on the July 16 call detail report—likewise lacked evidence of deliberate or reckless falsification and was immaterial to probable cause. It was therefore not clearly stronger than the issues Lodge pursued, and there is no reasonable probability that adding it would have changed the appeal.

To the extent Ground Four asserts a freestanding due process claim broader than the issue decided on appeal, that claim is procedurally defaulted. Byrd knew the factual basis for the claim before trial and litigated the allegedly falsified report before the District Court, but did not raise a distinct due process claim based on that alleged fabrication on Direct Appeal. *See Bousley*, 523 U.S. at 622–23. Because Lodge was not ineffective for omitting the claim, her representation cannot establish cause to excuse the default. Accordingly, the ineffective assistance component of Ground Four is **DENIED**, and any distinct freestanding due process claim is **DISMISSED** as procedurally defaulted. Ground Four is therefore **DISMISSED in part** and **DENIED in part**.

*3. Ground Five: Malaga robbery DNA evidence*

In Ground Five, Byrd alleges that the Government suppressed DNA evidence from the July 21, 2014 Malaga robbery. Mot. at 35–36. In making this claim, Byrd relies on three pieces of evidence: (1) Detective Kenneth Gonzalez's trial testimony that Lieutenant Matthew Finley located what Gonzalez described as "sweat on a leaf" in the wooded area near the Malaga bank; (2) a September 25, 2014 email from FBI Special Agent Michael Scimeca stating that a "different DNA profile" had been found at the Malaga robbery and that results concerning a potential contributor were not yet available; and (3) an October 2014 email thread captioned "Newfield Bank—2nd DNA Hit." *Id.*; Reply at 17, 63–64, 82; Apr. 9, 2019 Trial Tr. at 66, 70. Byrd treats these materials as evidence of an undisclosed Malaga DNA profile that could have identified another person as the robber, and argues that Lodge should have raised a *Brady* claim based on the Government's failure to disclose that purported evidence. Mot. at 35–36; Reply at 17, 63–64, 82.

As explained above, a *Brady* claim requires favorable evidence, suppression by the Government, and materiality—a reasonable probability that disclosure would have changed the

result. *Kyles*, 514 U.S. at 433–35. Byrd's theory fails because the record does not establish that the Government possessed favorable Malaga DNA evidence that it failed to disclose.

Start with the leaf. Gonzalez testified that Finley located what Gonzalez called "sweat on a leaf," but he did not testify that the substance was tested or even scientifically confirmed to be sweat. Apr. 9, 2019 Trial Tr. at 66, 70. The evidence from the Malaga robbery submitted to the New Jersey State Police laboratory for DNA testing consisted of samples taken from a black plastic bag, a head wrap, and two gloves. No leaf was submitted for testing. Apr. 8, 2019 Trial Tr. at 107–13. The record therefore does not establish that the substance observed on the leaf was human sweat, contained usable DNA, or came from the robber. The Constitution does not require investigators to conduct a particular forensic test simply because the test might conceivably produce exculpatory evidence. *See Arizona v. Youngblood*, 488 U.S. 51, 59 (1988) (explaining that police have no "constitutional duty to perform any particular tests"). Accordingly, the absence of DNA testing on the leaf does not itself establish the Government suppressed favorable evidence.

The September 25 email from FBI Special Agent Scimeca, however, is different because it expressly states that a "different DNA profile" had been found at the Malaga robbery and that investigators were awaiting results concerning a possible contributor. Critically, though, the email does not establish that the pending analysis ultimately identified another person or that the Government withheld any later result from Byrd. At trial, the forensic witnesses described the Malaga evidence and the DNA results obtained from those items. Apr. 8, 2019 Trial Tr. at 107–13, 138–41. When Byrd's known DNA sample was compared with the evidence obtained from the Malaga robbery, the head wrap cutting was the only sample suitable for comparison, and the analysis identified Byrd as the source of that DNA profile. *Id.* at 138–41. Byrd identifies no later laboratory report or other record corresponding to Scimeca's September email that identified

another person and was withheld from the defense. The reference to a result that was still pending, without more, does not establish that favorable evidence later existed and was suppressed.

The October email thread with a subject line "Newfield Bank—2nd DNA Hit" also does not show that evidence was suppressed. Although its subject line referred to a "2nd DNA Hit," Finley expressly identified that hit as DNA from an "Old Navy shirt." Crim. D.E. 141-2 at 173–75. That shirt was evidence from the July 19 *Vineland* robbery, not the Malaga robbery. Further, the shirt's DNA results were presented at trial: the testing tied the shirt to *Sanders* and excluded Byrd. Apr. 8, 2019 Trial Tr. at 131–38. The October email therefore does not describe an undisclosed second Malaga DNA profile.

In addition, Byrd has not shown that any allegedly suppressed DNA evidence obtained from the Malaga robbery was material. To establish materiality under *Brady*, Byrd must show a reasonable probability that disclosure of the evidence would have changed the result. Nothing Byrd identifies establishes that another person's DNA was recovered from an item attributable to the Malaga robber and withheld from the defense. To the contrary, the jury heard that DNA testing identified Byrd as the source of the profile on the head wrap recovered from the Malaga scene, and also heard Byrd's theory that officers had taken the item from his property and planted it at the scene. Apr. 10, 2019 Trial Tr. at 87–88. On this record, Byrd has not shown a reasonable probability that disclosure of any purported additional Malaga DNA evidence would have changed the verdict.

Finally, the record shows that Lodge considered this theory. Before the Direct Appeal, Byrd specifically directed Lodge to Gonzalez's testimony concerning the "sweat on a leaf" and characterized it as *Brady* material; Lodge responded that the leaf would support such a claim if it had been tested and contained someone else's DNA, and asked Byrd what evidence established

that premise. Reply at 63–65. The record supplied no such evidence. The record also did not establish that the September email ultimately led to an identifiable DNA profile belonging to another person or that the Government suppressed any resulting evidence.

Given these evidentiary deficiencies, the omitted *Brady* claim was not clearly stronger than the issues Lodge pursued, and there is no reasonable probability that raising it would have changed the result on appeal. Ground Five is therefore **DENIED.**

*4. Ground Six: The Government's in camera* Giglio *submission*

In Ground Six, Byrd alleges that the Government submitted sealed disciplinary information about an expected law enforcement witness for in camera review shortly before trial. Mot. at 38–43. The transcript he cites does not identify the witness by name. Byrd challenges both the procedure and the Court's decision not to order disclosure of the underlying material.

The record, however, shows that before the expected witness testified, the Court disclosed to Byrd in open court the substance of the discipline and explained why it did not warrant further disclosure or impeachment. On April 2, 2019—after the jury had left the courtroom for the day—the Court stated on the record that the Government had previously "made a disclosure to [the Court] under its *Giglio* obligation" concerning the expected witness. Apr. 2, 2019 Trial Tr. at 166–67. The witness had received a one-day suspension for neglect of duty more than ten years before trial, with "no findings whatsoever" of dishonesty or misleading conduct. *Id.* at 167. The Court therefore concluded that the incident did not require further disclosure under *Giglio*. *Id.* The separate ex parte proceeding referenced immediately afterward in the transcript concerned Byrd's requests for witness subpoenas and occurred after the prosecution left the courtroom. *Id.* at 168.

As explained above, *Brady* and *Giglio* do not entitle a defendant to an officer's personnel file merely because it might contain impeachment material. In *United States v. Dent*, the Third Circuit held that in camera review of an officer's personnel file "fully satisfied *Brady*'s due process requirements." 149 F.3d 180, 191 (3d Cir. 1998). The procedure used here therefore was permissible. Because the discipline was remote, minor, and unrelated to dishonesty or truthfulness, Byrd has not shown that the underlying material was material impeachment evidence or that its disclosure would have affected the trial.

Finally, the record shows that Lodge considered this issue. When she discussed it with Byrd, he argued that she should raise this issue on Direct Appeal because the previous discipline could support his theory of law enforcement bias. Reply at 64–65. Lodge responded that in camera review was permissible, the discipline did not concern truthfulness, and she saw no appealable error. *Id.* Given the permissible review procedure and the limited impeachment value of the discipline, the omitted claim was not clearly stronger than the issues Lodge pursued, and there is no reasonable probability that raising it would have changed the appeal. Ground Six is **DENIED**.

*5. Ground Seven: Burden of proof jury instruction*

Ground Seven identifies an oral misstatement during the Court's final charge to the jury. The Court told the jurors that "[t]o find the defendant not guilty, every one of [you] must agree that the defendant has failed to convince you beyond a reasonable doubt." Crim. D.E. 221 ("Apr. 11, 2019 Trial Tr.") at 48–49. Byrd argues that the sentence improperly shifted the burden of proof and that Lodge was ineffective for omitting the issue from the Direct Appeal. Mot. at 41–43. The Government concedes that the Court misspoke but argues that the charge as a whole cured the isolated error. Answer at 34–35.

A jury instruction is evaluated in context to determine whether there is a reasonable likelihood that the jury applied it unconstitutionally. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Middleton v. McNeil*, 541 U.S. 433, 437–38 (2004). Here, the surrounding instructions repeatedly placed the burden on the Government. The Court instructed the jury that Byrd was presumed innocent, had no obligation to prove his innocence, and could be convicted only if the Government proved every element beyond a reasonable doubt. *See, e.g.*, Apr. 11, 2019 Trial Tr. at 25–27, 35–48. Immediately before the misstatement, the Court correctly explained that a guilty verdict required unanimous agreement that the Government had overcome the presumption of innocence beyond a reasonable doubt. *Id.* at 48. The written charge likewise correctly stated that acquittal was required if "the Government has failed to convince you beyond a reasonable doubt," and the Court again correctly allocated the burden when explaining the verdict form and answering the jury's question concerning Count Seven. Crim. D.E. 211 ("Jury Charge") at 35; Apr. 11, 2019 Trial Tr. at 51–52, 102–06.

The Third Circuit rejected a similar challenge by a defendant where an oral charge contained a single phrase appearing to shift the burden to the defendant, but the written charge and repeated surrounding instructions correctly placed the burden on the Government. *United States v. Flores*, 454 F.3d 149, 156–59 (3d Cir. 2006). The same reasoning applies here.[6] Accordingly, Lodge reasonably omitted the claim from the Direct Appeal, and Byrd cannot show a reasonable probability that raising it would have changed the result. Ground Seven is therefore **DENIED**.

[6] Furthermore, because Byrd did not object to the instruction at trial, any appellate challenge would have been reviewed for plain error. *See Flores*, 454 F.3d at 156–57 (applying plain error review to an unpreserved challenge to a jury instruction); Fed. R. Crim. P. 30(d), 52(b).

*6. Ground Eight: Judicial bias*

In Ground Eight, Byrd contends that Judge Kugler's rulings, comments, and case management decisions demonstrated bias against him. Byrd principally cites two comments Judge Kugler made in February 2018: (1) he stated that Byrd was "obsessed" with whether his car had been falsely placed at the Bogan shooting and; (2) when discussing the relevance of that issue to the bank robbery trial, Judge Kugler said, "Who cares." Crim. D.E. 139 ("Feb. 16, 2018 Hr'g Tr.") at 19–21. Byrd also characterizes an April 10, 2019 sidebar as a secret effort to advise the Government how to present its case. Mot. at 44–57. And Byrd contends that Lodge was ineffective for failing to raise the judicial bias issue on Direct Appeal.

Recusal is required when a judge's impartiality might reasonably be questioned or the judge has a personal bias or prejudice. 28 U.S.C. § 455(a), (b)(1). Ordinarily, rulings, critical remarks, and case management decisions do not establish bias unless they reveal favoritism or antagonism so severe that fair judgment is impossible. *Liteky v. United States*, 510 U.S. 540, 555–56 (1994).

Viewed in context, the February 2018 remarks do not establish bias. The "obsessed" comment arose as Byrd again pressed his contention that investigators had falsely placed his car at the Bogan shooting, after the Court had already rejected his probable cause challenge and questioned the significance Byrd attributed to the call detail report. Judge Kugler responded that he had never seen anything in a police report or transcript indicating that Byrd's car had been at the shooting and reiterated that the disputed car entry had played no role in the Court's probable cause determination. Feb. 16, 2018 Hr'g Tr. at 19–20.

The "who cares" remark followed as the Court explained that whether Byrd's car had been present at the scene of an unrelated state crime was unlikely to be relevant to his federal bank robbery trial. *Id.* at 21–22. Although sharply phrased, the remarks reflected the Court's assessment

of the relevance of a repeatedly litigated issue and its effort to manage the case, not personal prejudice or the type of deep-seated antagonism contemplated by *Liteky*.

Byrd's claim of bias arising from the April 10 sidebar is similarly unpersuasive. There, the Government asked whether it could question Byrd about his prior convictions. The Court permitted appropriate impeachment and then, seemingly in a joking manner, asked whether the Government intended to play additional portions of Byrd's recorded statement after Byrd had accused it of editing the recording, immediately adding, "I'm just kidding." Apr. 10, 2019 Trial Tr. at 66. The Court then limited the Government's use of Byrd's prior convictions and agreed to give a limiting instruction. *Id.* at 67–68. Nothing in the exchange suggests that the Court directed the prosecution's strategy or favored the Government.

Because the underlying judicial bias claim lacked merit, Lodge reasonably omitted it from the Direct Appeal. The claim was not clearly stronger than the issues she pursued, and Byrd has not shown a reasonable probability that the Third Circuit would have ordered recusal or otherwise reversed his convictions had Lodge raised it. Accordingly, Ground Eight is **DENIED**.

*7. Ground Nine: Challenges to Count Seven of the Superseding Indictment*

Ground Nine concerns Count Seven of the Superseding Indictment, which charged Byrd with possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). Byrd contends that Lodge provided ineffective assistance by failing to challenge his conviction on two bases: (1) the jury was not instructed that Byrd had to know of his status as a convicted felon when he possessed the firearm, as required by *Rehaif v. United States*, 588 U.S. 225 (2019); and (2) § 922(g)(1) violates the Second Amendment as applied to him. Mot. at 58–61. The Court addresses these arguments in turn.

**a. *Rehaif***

At Byrd's trial, the Court instructed the jury consistently with the law as it was then understood: the Government had to prove that Byrd knowingly possessed the firearm, but not that he knew of his status as a convicted felon. Apr. 11, 2019 Trial Tr. at 40–42. Two months later, however, the Supreme Court decided *Rehaif*, which held that § 922(g) requires the Government to prove both that the defendant knowingly possessed the firearm and that he knew of his prohibited status. 588 U.S. at 237. Because Byrd's conviction was not yet final, *Rehaif* was an intervening decision that applied to his case.

Lodge initially had substantial authority to seek relief. In December 2020, the Third Circuit sitting en banc applied *Rehaif* to a pre-*Rehaif* conviction and vacated the § 922(g) conviction on plain error review. *United States v. Nasir*, 982 F.3d 144, 170–76 (3d Cir. 2020) (en banc). Relying on *Rehaif* and *Nasir*, Lodge raised the same basic argument in Byrd's January 2021 Rule 33 Motion. Rule 33 Motion at 110–14.

However, the law changed before Lodge filed Byrd's appellate brief. In June 2021, the Supreme Court decided *Greer v. United States* and held that an unpreserved *Rehaif* error warrants plain error relief only if the defendant shows a reasonable probability that, had the jury been properly instructed, it would have acquitted him because he did not know of his felony status. 593 U.S. 503, 507–10 (2021). Prior felony convictions are substantial evidence of that knowledge, and the appellate court may consider the entire record. *Id.* at 509–11. The Supreme Court thereafter vacated *Nasir*, and the Third Circuit, applying *Greer* on the remand of *Nasir*, affirmed Nasir's § 922(g) conviction. *United States v. Nasir*, 17 F.4th 459, 470 n.4 (3d Cir. 2021) (en banc). That decision issued one week before Lodge filed Byrd's Appellate Brief. Lodge therefore reasonably omitted the *Rehaif* challenge.

In any event, Byrd cannot show prejudice. Byrd stipulated to a qualifying felony conviction and acknowledged that he had served a lengthy prison sentence for aggravated manslaughter. Apr. 11, 2019 Trial Tr. at 40; Apr. 10, 2019 Trial Tr. at 69–70. His criminal history included additional aggravated assault and weapons convictions. Crim. D.E. 254 ("Government Sentencing Submission") at 5. He identifies no evidence suggesting that he was unaware of his felony status when he possessed the firearm. Under *Greer*, there is therefore no reasonable probability the Third Circuit would have vacated Count Seven on plain error review. Accordingly, Lodge's omission of the *Rehaif* claim was neither objectively unreasonable nor prejudicial.

**b. Second Amendment challenge to § 922(g)(1)**

Byrd's as-applied Second Amendment theory likewise fails. When Lodge filed Byrd's opening brief in November 2021, *Folajtar v. Attorney General*, 980 F.3d 897 (3d Cir. 2020), governed § 922(g)(1) challenges in this Circuit. *Folajtar* broadly permitted the disarmament of persons convicted of serious crimes. *Id.* at 900–02. While Byrd's Direct Appeal remained pending, however, the Supreme Court decided *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), which rejected the framework on which *Folajtar* relied and replaced it with a test centered on constitutional text and historical tradition. More specifically, *Bruen* held that when the Second Amendment's text covers a person's conduct, the Government must justify a firearm restriction by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. *Id.* at 17, 24.

Although *Bruen* did not itself address § 922(g)(1), the Third Circuit later applied *Bruen* to § 922(g)(1) in *Range v. Attorney General*, where the court expressly recognized that *Bruen* had abrogated the Circuit's prior Second Amendment framework. 124 F.4th 218, 225–26 (3d Cir. 2024) (en banc). Under *Range*, if the Second Amendment's text covers the challenger and his

proposed conduct, the Government must establish a historical tradition supporting § 922(g)(1)'s application to that individual. *Id.* at 226–32. Applying *Bruen*'s framework, *Range* held § 922(g)(1) unconstitutional as applied to a man whose disqualifying conviction was a decades-old, nonviolent food-stamp offense and whose record contained no evidence that he posed a physical danger to others. *Id*. at 222–24, 232. Thus, even assuming Lodge should have sought to raise a *Bruen*-based challenge before Byrd's appeal was resolved, Byrd cannot establish prejudice if his claim fails under the more favorable framework that *Range* subsequently developed from *Bruen*.

In *Pitsilides v. Barr*, the Third Circuit further explained how *Range* and *Bruen* apply to an individualized § 922(g)(1) challenge. 128 F.4th 203, 210–13 (3d Cir. 2025). A person may remain disarmed when he would likely pose a physical danger to others if armed, and that inquiry requires consideration of the predicate offense and underlying conduct, the person's entire criminal history, and postconviction conduct bearing on dangerousness. *Id.* Indeed, some offenses may themselves provide conclusive evidence of the requisite danger. *Id.* at 211.

Byrd's circumstances are meaningfully different from those at issue in *Range*. Byrd's prior record includes aggravated manslaughter, aggravated assault, and weapons offenses. *See* Government Sentencing Submission at 5. Unlike the record in Range, therefore, Byrd's record contains direct and substantial evidence of past violent conduct and dangerousness. *See Pitsilides*, 128 F.4th at 210–13; *cf. United States v. Rahimi*, 602 U.S. 680, 698–700 (2024) (upholding § 922(g)(8) as applied after a judicial finding of a credible threat of physical violence). Thus, even under current Second Amendment law, there is no reasonable probability that a challenge to § 922(g)(1) as applied to Byrd would have changed the result of his appeal.

* * *

Accordingly, neither omitted challenge to Count Seven creates a reasonable probability of a different appellate result. Ground Nine is **DENIED**.

*8. Ground Ten: Prosecutorial vouching*

In Ground Ten, Byrd claims that the prosecutor twice improperly vouched for Sanders.[7] Mot. at 62–68. Improper vouching occurs when a lawyer assures the jury of a witness's credibility based on personal knowledge or information outside the record. A lawyer may, however, argue from the trial evidence that a witness should be believed. *See, e.g.*, *United States v. Lore*, 430 F.3d 190, 211–12 (3d Cir. 2005) (finding no improper vouching where, viewed in context, the prosecutor argued from evidence in the record that the Government's witnesses were credible).

Byrd identifies two statements that were allegedly improper vouching. *First*, the prosecutor stated outside the jury's presence, and while opposing Byrd's Rule 29 motion for a judgment of acquittal, that Sanders's testimony "was credible . . . consistent with the evidence and . . . made sense." Apr. 11, 2019 Trial Tr. at 4. Put simply, because improper vouching must occur when a lawyer assures a jury of a witness's credibility, that statement cannot constitute improper vouching because the jury never heard it. *Id.* at 3–5.

*Second*, during rebuttal, the prosecutor argued that Sanders "was credible," but immediately tied that assessment to evidence corroborating his testimony, including testimony concerning Byrd's firearm, the bank tellers' accounts, DNA evidence, and masks and clothing recovered during the investigation. *Id.* at 96–97. Because the prosecutor relied on the trial record rather than personal knowledge or information unavailable to the jury, the argument that Sanders was credible was permissible. *See Lore*, 430 F.3d at 211–12.

---

[7] As noted earlier, Sanders participated in the July 19, 2014 Vineland robbery and testified that Byrd was his armed accomplice. *See* Apr. 9, 2019 Trial Tr. at 107–31.

Because neither statement amounted to improper vouching, the omitted claim was not clearly stronger than the issues Lodge pursued, and Byrd accordingly has not shown a reasonable probability that raising it would have changed the appeal. Ground Ten is **DENIED**.

*9. Ground Twelve: Delayed recovery of cartridge casing*

In Ground Twelve, Byrd challenges the admission of a cartridge casing recovered near the Malaga robbery scene approximately two months after the robbery. He argues that earlier searches had not located it, that the later recovery was suspicious, and that Lodge should have challenged its relevance, authenticity, and chain of custody on appeal. Mot. at 75–80.

Before trial, the Court ruled that Byrd could argue that the delayed recovery was suspicious, but that the casing would be admitted if the Government supplied an adequate foundation. Mar. 27, 2019 Hr'g Tr. at 22–24; Mar. 28, 2019 Order at 3. At trial, Robert DeMarchi of the Vineland Police Department testified that investigators later returned to the wooded area near the Malaga bank, where he collected a casing found near the location of a previously recovered head wrap. Apr. 3, 2019 Trial Tr. at 55–58. Lieutenant Kenneth Gonzalez further explained that the area was heavily overgrown and that investigators returned to the site after they narrowed the search area based on a witness's account. Apr. 9, 2019 Trial Tr. at 67–69. After returning to search the targeted area, law enforcement cleared the vegetation and located the casing with a metal detector. At trial, defense counsel cross-examined Gonzalez about the two-month delay and circumstances of the recovery. *Id.* at 75–76. Byrd also stated that he had no objection when the photograph of the casing and the casing itself were admitted. Apr. 3, 2019 Trial Tr. at 56, 58.

A perfect chain of custody is unnecessary to admit evidence. The Government need only provide a rational basis to find that the evidence is what the party seeking its admission claims, while ordinary gaps in the chain go to weight rather than admissibility. *See United States v.*

*Rawlins*, 606 F.3d 73, 82–83 (3d Cir. 2010). At trial, the testimony concerning where and how the casing was recovered, together with DeMarchi's identification of it, supplied that basis. The casing's recovery near where a witness reported that the robber fired made it relevant, and the delayed discovery went to the casing's weight—an issue the defense was permitted to explore before the jury. Byrd identifies no evidence that the casing was altered, substituted, or planted.

Accordingly, the omitted appellate challenge was not clearly stronger than the issues Lodge pursued. Nor has Byrd shown a reasonable probability that raising it would have changed the result of his appeal. Ground Twelve is **DENIED**.

* * *

In sum, the freestanding claims in Grounds One, Four through Ten, and Twelve are **DISMISSED** as procedurally defaulted. The associated ineffective assistance claims are **DENIED** because Byrd has shown neither deficient performance nor prejudice.

### C. Ground Fifteen: UDHR and Conspiracy

Finally, in Ground Fifteen, Byrd claims that prosecutors and FBI agents secretly conspired to violate Byrd's constitutional rights and the Universal Declaration of Human Rights ("UDHR"). Mot. at 95–96. Adopted by the United Nations General Assembly in 1948, the UDHR is a statement of human rights principles, not a treaty or international agreement imposing legal obligations on the United States. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 734 (2004). The UDHR is a "nonbinding declaration that provides no private rights of action." *United States v. Chatman*, 351 F. App'x 740, 741 (3d Cir. 2009). Because § 2255 authorizes relief for violations of the Constitution or laws of the United States, the UDHR supplies no independent basis for vacating Byrd's conviction or sentence. *See* 28 U.S.C. § 2255(a).

To the extent Byrd also claims that prosecutors and agents conspired to violate his constitutional rights, that claim also fails. Fatally, Byrd identifies no specific agreement to violate any constitutional right and no misconduct independent of the investigative, suppression, disclosure, evidentiary, and bias allegations addressed above. Those allegations do not become a constitutional violation merely because Byrd characterizes them as part of a conspiracy. Because Ground Fifteen presented no viable appellate issue, Lodge was not ineffective for omitting it from Byrd's direct appeal. Accordingly, Ground Fifteen is **DENIED**.

## IV. MOTIONS TO COMPEL

### A. Motion to Compel Surveillance Footage and Conditions at USP Victorville

In his First Motion to Compel, Byrd seeks preservation and production of surveillance footage, return of legal materials, placement in a single cell, protection from further harm, and a deposition concerning an alleged June 5, 2026 attack at USP Victorville. *See* First Motion to Compel. He contends that prisoners assaulted him with staff assistance in retaliation for challenging his convictions.

Section 2255 provides a means to challenge the validity of a federal conviction or sentence, not the conditions under which a sentence is served. *See Cardona v. Bledsoe*, 681 F.3d 533, 536–37 (3d Cir. 2012). Discovery is available in a § 2255 proceeding only upon a showing of good cause, which requires a petition to provide specific allegations suggesting that the requested development may establish entitlement to habeas relief. *See* Rule 6(a) of the Rules Governing Section 2255 Proceedings; *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997).

The requested footage and relief concern a 2026 prison incident. Because they would not establish that Byrd's 2019 convictions or 2021 sentence are unlawful, the First Motion to Compel is **DENIED *without prejudice***. Byrd may pursue any appropriate claim concerning the alleged

conditions of confinement in a separate civil action in a court with jurisdiction over that claim. The Court expresses no view on the merits of his allegations.

### B. Motion to Compel Malpractice Insurance Information

In the Second Motion to Compel, Byrd seeks the "legal malpractice insurance information" of four Assistant United States Attorneys involved in the Criminal Action. *See* Second Motion to Compel. Byrd states that he wants the information for contemplated civil litigation against them.

To obtain discovery under Rule 6(a), Byrd must show that the requested information may establish his entitlement to habeas relief. Insurance information for prospective civil claims cannot do so, and this § 2255 proceeding cannot be used to obtain discovery for a separate, unfiled civil action.

Byrd has not shown good cause under Rule 6. Accordingly, the Second Motion to Compel is **DENIED**.

## V. EVIDENTIARY HEARING AND CERTIFICATE OF APPEALABILITY

The Motion and record conclusively show that Byrd is not entitled to relief, so no evidentiary hearing is required. 28 U.S.C. § 2255(b). Reasonable jurists also would not debate the Court's procedural or merits rulings. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Byrd's requests for an evidentiary hearing and a certificate of appealability are **DENIED**.

## VI. CONCLUSION

For these reasons, the § 2255 Motion and Second Motion to Compel are **DENIED**, and the First Motion to Compel is **DENIED *without prejudice***. An appropriate Order follows.

Date: September 16, 2026

Evelyn Padin, U.S.D.J.